STATE of Wisconsin,
Plaintiff-Respondent,

v.

Henry E. ROUTON,
Defendant-Appellant.†

Court of Appeals

*No. 2006AP2557–CR. Submitted on briefs April 16, 2007.
—Decided June 21, 2007.*

2007 WI App 178

(Also reported in 736 N.W.2d 530.)

† Petition to review denied 9/10/07.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jefren E. Olsen,* asst. state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James M. Freimuth,* asst. attorney general, and *J.B. Van Hollen,* attorney general.

Before Dykman, Vergeront and Bridge, JJ.

¶ 1. VERGERONT, J. Henry E. Routon appeals the circuit court's judgment convicting him of one count of conspiracy to manufacture psilocybin/psilocin contrary to Wis. Stat. §§ 961.41(1)(g) and (1x) (2005–06).[1] Psilocybin and psilocin are hallucinogenic substances that are produced by psilocybe mushrooms.[2] Routon contends that the evidence presented in the trial to the

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[2] Wisconsin Stat. § 961.14(4)(r) and (s) list psilocybin and psilocin as hallucinogenic substances. Because it is not necessary on this appeal, we do not distinguish between the two substances, but refer to them as psilocybin/psilocin. The record

court was insufficient to prove that he conspired to manufacture psilocybin/psilocin because the evidence showed he made only one sale and the sale was of legal materials—the spores of the psilocybe mushrooms and a grow kit.

¶ 2. We conclude there is sufficient evidence that Routon knew that the buyer intended to use the spores to illegally manufacture psilocybin/psilocin by growing mushrooms, and that he intended to further, promote, and cooperate in the buyer's illegal growing of the mushrooms. We further conclude this evidence is sufficient to establish two elements of the charge—that Routon intended that the crime of manufacture of psilocybin/psilocin be committed and that he agreed with at least one other person to commit that crime. Because there is also sufficient evidence that one of the parties to the conspiracy committed an act in furtherance of the manufacturing—which Routon does not dispute—we conclude there is sufficient evidence to prove all three elements of the charge beyond a reasonable doubt. Accordingly, we affirm the judgment of conviction.

## BACKGROUND

¶ 3. The charge against Routon stems from the sale to Special Agent Michelle Smith[3] of nine syringes labeled as containing psilocybe spores and a kit for growing mushrooms. The parties agree that the spores used to cultivate psilocybe mushrooms do not contain psilocybin/psilocin and it is legal under Wisconsin law

shows that the mushrooms are called "psilocybe cubensis" mushrooms, but we shorten that to "psilocybe."

[3] Michelle Smith is employed by the Wisconsin Department of Justice.

to possess, sell, or distribute the spores "in and of themselves." Routon's mother, Gwendolyn Routon, was also charged with conspiring to manufacture psilocybin/psilocybin, was tried with Routon, and was also convicted. While this appeal challenges only Routon's conviction, evidence relating to his mother is recounted when relevant.

¶ 4. In the trial to the court, Agent Smith testified that she and other special agents executed a search warrant on a Dane County residence where they found 100 grams of mushrooms that tested positive for psilocybin and packages of syringes that they believed contained psilocybe spores. In one of the packages the agents found syringes and a packing slip from "Spore Magic/Buzz Magic" which listed four syringes and corresponding prices, plus a handwritten note indicating "+ 1 free." The packing slip contained the statement: "Customer Message: As Stealth as possible please :)."

¶ 5. Sporemagic.com and Buzzmagic.com are website businesses started and operated by Routon. Agent Smith found websites for sporemagic.com and buzzmagic.com, which we will refer to collectively as the website.[4] The website home page contained links to various other pages, one of which was "microscopy spores." This page showed a variety of strains of psilocybe mushroom spores that one may order. Another page offered grow kits. There was also a link to an "edibles" page, but, Agent Smith testified, there were no

---

[4] Agent Smith testified that sporemagic.com had a link to buzzmagic.com, and that buzzmagic.com was similar in format to sporemagic.com. It is not always clear from her testimony and from the exhibits which website she is referring to, and neither the parties nor the circuit court distinguished between them. Therefore we refer to both as "the website." We will refer to the business as "Spore Magic/Buzz Magic."

edible mushrooms listed on that page and the relevant page in the exhibit showed none listed.

¶ 6. The website required the user to agree to a disclaimer before entering. The disclaimer stated that the buyer verifies that he or she is over eighteen years of age, not a resident of California or Georgia,[5] and "will use this site's product(s) only for microscopy purposes." The disclaimer also stated: "Products contained herein are provided FOR EDUCATIONAL and INFORMATIONAL PURPOSE ONLY. Nothing contained on this web site shall be constituted as a recommendation to or act upon the commission of any illegal act." The home page and several other pages contained this notice: "Please note that the cultivation of psilocybe spores is illegal in the USA and in some countries." On the page that sold grow kits there was a notice that stated: "These kits are to be used for Edible Strains ONLY! Spore Magic will not ship these kits with any other of Microscopy Spore Strains!"

¶ 7. Certain pages of the website contained literature related to other illegal controlled substances. The website contained links to other sites including smokelegalbuds.com, drinkabsinthe.com, and "Uncle Mike's Psychedelic Shack," as well as advertising from "Ya Hooka, the Guide to Marijuana on the Internet." The page that contained the shipping information stated:

> I do not keep any records of orders and I do not keep your address. I shred and burn all orders and addresses. All packages are modest and there is no way someone will know what is in the package unless they open it.
>
> I mark the return address simply as Uncle Mike . . . .

---

[5] California and Georgia have restrictions on the sale and/or possession of psilocybe spores. *See* CAL. HEALTH & SAFETY CODE §§ 11390–11392 (2006), and GA. CODE ANN. §§ 13–16–71 (627) and 13–16–72 (2006).

¶ 8. Using an email address she created for the investigation, Agent Smith sent an email to the address listed on the website that said: "Hi, Which of your spores would you recommend for a home-grow situation? I have no experience with this. Thanks!" She did not receive a response. A few days after sending the email, she sent by mail to the post office box address on the website a handwritten order for nine varieties of psilocybe spores, which were offered at a discount rate of "Buy 6, Get 3 Free," and an order for a "super mushroom grow kit with fruiting chamber." At the end of the order request, the agent wrote "I can't wait to see how good I am at growing these." She signed the order with a fictitious name, "Charles Hagberg," and gave as her address a post office box she had obtained for purposes of this investigation.

¶ 9. About ten days later, Agent Smith received a package of syringes at her post office box, each labeled as containing the psilocybe spores she ordered. That same day she sent an email to the Spore Magic/Buzz Magic address that said, "Hi! I got my package from you today that had the 9 syring[e]s that I ordered, but the grow kit wasn't there. Is it coming later? How much later? I can't wait to get started!!!!" She received a response the next day stating: "It was mailed the same day[;] it takes large packages longer to get there. I always mail the syringes separate[.]" A few days later she received a package containing the grow kit she had ordered.[6] The package did not contain instructions on

---

[6] Agent Smith described the contents of the "grow kit" as follows:

> It was a large plastic-lidded tub. There were 12, half-pint size Mason jars that were filled with a brown grain-like substance. Each of the jars had aluminum foil over the top, then the canning lid with four holes punctured in the top, a piece of plastic, and then

how to grow mushrooms but, Agent Smith testified, "instructions on how to grow these types of mushrooms [are] available on the Internet."

¶ 10. Agent Smith testified that she did not attempt to cultivate the spores she received in the syringes and the syringes were never tested to verify that the contents were in fact psilocybe spores. She did not attempt to place any other orders with Spore Magic/Buzz Magic and no one from the website contacted her about making additional purchases.

¶ 11. The State submitted evidence that Routon's mother, as well as Routon, was involved in the operation of the business and that his mother's fingerprints were on some of the items shipped to Agent Smith.

¶ 12. The State also presented evidence of recorded telephone calls between Routon and his mother while he was being held in the Dane County Jail. In one of the calls, he asked his mother to send his attorney "dead" psilocybe spores because "that's part of where we're, if we gotta go to trial, we're gonna use for defense."

¶ 13. The circuit court found that the State had produced sufficient evidence, including reasonable inferences from the evidence, that, beyond a reasonable doubt, Routon and his mother were engaged in a conspiracy to commit the offense of manufacturing psilocybin/psilocin. The court rejected Routon's argument that more than a single sale to Agent Smith was required in order to establish a conspiracy.

¶ 14. On the element of intent to commit the offense of manufacturing psilocybin/psilocin, the court found the disclaimers were a sham and a smoke screen because the business had in fact sent both psilocybe spores and a grow kit to Agent Smith and the website

---

the jar ring. And there was a bag containing a white substance which the Spore Magic site calls perlite.

did not offer edible mushrooms for sale. The court also found that the nature of the links to other websites, coupled with the absence of links to educational or research sites, and the "stealth" business practices showed intent to commit the manufacturing offense, and that the conversation in which Routon asked his mother to send dead spores was evidence that they had been sending psilocybe spores for the purpose of growing them. The court acknowledged that the State had not proved the spores sent to Agent Smith were actually psilocybe spores and stated that this had given it "the most pause." However, the court concluded there was sufficient circumstantial evidence to establish intent. Finally, the court found that Routon's mother had committed an act in furtherance of the conspiracy in sending the spores and the grow kit to the agent.

## DISCUSSION

¶ 15. On appeal, Routon renews his argument that there is insufficient evidence to establish that he intended to commit the crime of manufacturing psilocybin/psilocin and that he had an agreement with Agent Smith to do so. Routon relies primarily on cases from other jurisdictions, which, he asserts, establish that there must be an ongoing relationship between the seller and the buyer sufficient to involve the seller in some way in the buyer's illegal conduct. Routon asserts that the single sale to Agent Smith is insufficient to establish the requisite intent and agreement, emphasizing that the goods sold Agent Smith—the psilocybe spores and the grow kit—were both legal.

¶ 16. The State's position is that there is sufficient evidence that Routon intended that Agent Smith manufacture psilocybin/psilocin and that he and his mother entered into an agreement with her for that

purpose. According to the State, the cases on which Routon relies either do not require the result he advocates or are inapplicable when the intended crime is manufacturing an illegal substance rather than distribution.

¶ 17. In reviewing challenges to the sufficiency of evidence, we give great deference to the trier-of-fact and do not substitute our judgment unless the evidence, viewed most favorably to the verdict, is so lacking in probative value and force that no reasonable fact-finder could have found guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). If more than one inference can reasonably be drawn from the historical facts presented at the trial, we accept the inference drawn by the fact-finder, even if other inferences could be drawn. *See State v. Drogsvold*, 104 Wis. 2d 247, 256, 311 N.W.2d 243 (Ct. App. 1981). This deferential standard of review "is the same whether the fact-finder is the court or a jury." *State v. Oppermann*, 156 Wis. 2d 241, 247, 456 N.W.2d 625 (Ct. App. 1990). However, whether the evidence viewed most favorably to the verdict satisfies the legal elements of the crime constitutes a question of law, which we review de novo.[7] *See State v. Cavallari*, 214 Wis. 2d 42, 47, 571 N.W.2d 176 (Ct. App. 1997).

---

[7] The State argues that the de novo standard of review we applied in *State v. Cavallari*, 214 Wis. 2d 42, 47, 571 N.W.2d 176 (Ct. App. 1997), is inapplicable because "the issue of whether the particular buy-sell agreement constituted a conspiracy to deliver controlled substances depended on statutory interpretation, a question of law." In *Cavallari*, we attempted to identify under what circumstances a certain relationship "might ripen into, or constitute, a conspiracy" under Wis. Stat. § 961.41(1x). *Id.* at 49. Although the underlying crime in *Cavallari* was the delivery, rather than manufacture, of controlled substances, the

¶ 18. WISCONSIN STAT. § 939.31 sets forth the elements of the crime of conspiracy applicable under WIS. STAT. § 961.41(1x).[8] Section 939.31 provides:

> .... whoever, with intent that a crime be committed, agrees or combines with another for the purpose of committing that crime may, if one or more of the parties to the conspiracy does an act to effect its object, be fined or imprisoned or both ....

Thus, there are three elements: (1) an intent by the defendant that the crime be committed; (2) an agreement between the defendant and at least one other person to commit the crime; and (3) an act performed by one of the conspirators in furtherance of the conspiracy. WIS JI—CRIMINAL 570; *State v. West*, 214 Wis. 2d 468, 476, 571 N.W.2d 196 (Ct. App. 1997).

¶ 19. The crime that is the subject of the conspiracy need not be committed in order for a violation of WIS. STAT. § 939.31 to occur; rather, the focus is on the intent of the individual defendant. *State v. Sample*, 215 Wis. 2d 487, 501–02, 505, 573 N.W.2d 187 (1998). For this reason, a person can be convicted under § 939.31 even if the other party to the conspiracy is an under-

legal analysis concerned the same conspiracy statute, § 961.41(1x), at issue in this case. We see no reason why a de novo standard of review is inapplicable here insofar as Routon is challenging whether the facts as found by the circuit court and the reasonable inferences drawn by the circuit court are sufficient to fulfill the statutory elements of the crime.

[8] As we explained in *Cavallari*, 214 Wis. 2d at 48 n.2, the cross-references in the two statutes pertain to the different penalties that flow from a conspiracy conviction under WIS. STAT. § 961.41(1x) and under WIS. STAT. § 939.31, but the substantive definition of conspiracy is found in § 939.31.

cover agent who did not intend to commit the crime. *See id.* Thus, the fact that Agent Smith did not intend to manufacture psilocybin/psilocin does not preclude a determination that Routon is guilty of conspiracy.

¶ 20. Routon's challenge concerns the sufficiency of the evidence to establish the first and second elements; he expressly concedes that the third element is satisfied by the evidence that Routon's mother's fingerprints were on the materials sent to Agent Smith.

■

¶ 21. The agreement to commit a crime that is necessary for a conspiracy may be demonstrated by circumstantial evidence and need not be express; a tacit understanding of a shared goal is sufficient. *Cavallari*, 214 Wis. 2d at 51. The intent to commit the crime may be inferred from the person's conduct. *See State v. Hecht*, 116 Wis. 2d 605, 626–27, 342 N.W.2d 721 (1984). Although the supreme court in *State v. Nutley*, 24 Wis. 2d 527, 556, 129 N.W.2d 155 (1964), referred to "a stake in the venture" in describing the intent element, the supreme court has since made clear that a stake in the venture is not a necessary element of the crime of conspiracy. *Hecht*, 116 Wis. 2d at 627. Evidence of a stake in the venture "may be persuasive of the degree of the party's involvement" in the crime, but the lack of such evidence "does not absolve one of party to a crime liability [for conspiracy]." *Id., see also Sample*, 215 Wis. 2d at 504 n.17.

¶ 22. Wisconsin case law has addressed a sufficiency-of-the-evidence challenge where the conspiracy charge is to distribute a controlled substance. *State v. Smith*, 189 Wis. 2d 496, 501–04, 525 N.W.2d 264 (1995), establishes that the sale of a small amount consistent with personal use is not sufficient to transform a possession charge against the buyer into a

conspiracy to distribute. Rather, the State must prove an agreement between the buyer and seller for further delivery to a third person, and "mere *knowledge* by the supplier of the purchaser's intent to further distribute . . . is not enough." *Cavallari*, 214 Wis. 2d at 52 (emphasis original).

¶ 23. However, Wisconsin case law has not addressed a sufficiency-of-the-evidence challenge in a case in which a person is alleged to be a member of a conspiracy—in particular, a conspiracy to manufacture a controlled substance—based on the person's sale of goods that are not illegal to sell or possess. Both parties agree that two United States Supreme Court cases— *United States v. Falcone*, 311 U.S. 205 (1940), and *Direct Sales Co. v. United States*, 319 U.S. 703 (1943)—provide relevant analyses, although the parties disagree on how those analyses apply in this case.

¶ 24. The defendants in *Falcone*, 311 U.S. at 206–07, sold sugar, yeast, or cans to persons who produced illegal distilled spirits. The lower court assumed there was sufficient evidence that the sellers knew these products ultimately were used by the distillers, but concluded that knowledge alone was insufficient to prove the sellers were involved in a conspiracy. *Id.* at 207. Before the Supreme Court, the government effectively conceded this point and instead contended that one who, with knowledge of a conspiracy to produce illegal distilled spirits, sold materials to a conspirator knowing they would be used in the distilling is himself guilty of a conspiracy. *Id.* at 207–08. Without addressing the correctness of this new theory, the Court concluded there was insufficient evidence to show the sellers had knowledge of a conspiracy among the distillers. *Id.* at 208–10.

¶ 25. The reach of *Falcone* was the subject of the later case, *Direct Sales*. The defendant in *Direct Sales*,

319 U.S. at 704, was a registered drug manufacturer and wholesaler that sold by mail order large quantities of morphine sulfate to a registered physician, who illegally dispensed the drug. Relying on *Falcone*, the defendant argued there was insufficient evidence of a conspiracy between it and the doctor because its drug sales to the doctor were legal and at most it had knowledge that the doctor was selling the drugs illegally. *Id.* at 708. The Court stated that this was a misconstruction of *Falcone* because *Falcone* did not decide that one who sells to a buyer with knowledge that the buyer will use "the article for an illegal purpose cannot, under any circumstances, be found guilty of conspiracy with the buyer to further his [or her] illegal end." *Id.* at 709. Instead, *Falcone* held that "one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally." *Id.* The Court pointed out that the government in *Falcone* had conceded there was insufficient evidence to establish a conspiracy between the buyer and seller alone; and, although the *Falcone* Court had accepted that concession, it did not decide whether the concession was well-founded. *Id.* at 710.

¶ 26. In analyzing whether there was sufficient evidence to establish a conspiracy between the buyer and the seller in *Direct Sales*, the Court first discussed some general principles. The Court observed that the "gist" of a conspiracy in this context is the "[seller's] intent, when given effect by overt act" to "further, promote, and cooperate" in the buyer's intended illegal use. *Id.* at 711. In order to establish that intent on the part of the seller, there must be evidence of the seller's

knowledge of the buyer's intended illegal use and "[that] evidence of knowledge must be clear, not equivocal." *Id.* While clear evidence of knowledge is not necessarily sufficient to establish intent, in some cases the evidence that clearly establishes knowledge will also prove intent.[9] *Id.* at 711–12.

¶ 27. The Court in *Direct Sales* elucidated these general principles in the context of discussing the significance of the nature of the products sold: when products are articles of "normal trade," such as sugar, corn, and cans, more proof is required to show the seller's knowledge of the buyer's intended illegal use than when the goods sold are restricted because of their inherent capacity for harm. *Id.* at 711–12. The Court concluded that the evidence of the restricted nature of the drugs sold, coupled with the evidence of the quantity sold to the doctor, the frequency of sales, the period

---

[9] The federal conspiracy statute in *Direct Sales Co. v. United States*, 319 U.S. 703, 704 n.1 (1943), provided that

> [i]f two or more persons conspire either to commit any offense against the United States . . . and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000 or imprisoned not more than two years, or both.

Unlike WIS. STAT. § 939.31, the federal statute does not separately state as elements intent to commit the crime and an agreement to commit the crime. No doubt for that reason, the Court discussed intent in the context of what constituted an agreement, or a conspiracy, but did not discuss intent to commit the crime as a separate element. Neither party suggests that this makes the Supreme Court's analysis less useful. Thus, the parties make the apparently reasonable assumption that, if the evidence is sufficient to prove that the defendant agreed with another to commit a crime, that same evidence would also be sufficient to prove that the defendant intended to commit that crime.

of time over which it sold to the doctor, and the high pressure, volume discount method of sales, was sufficient to prove not only knowledge and acquiescence, but also "informed and interested cooperation, stimulation, instigation" by the defendant. *Id.* at 713. The Court also observed that, while a stake in the venture was not essential, it was not irrelevant and the defendant made profits from the doctor's illegal operations, which the defendant encouraged. *Id.*

¶ 28. In Routon's view, in order to determine whether there is sufficient evidence of both knowledge and intent in this case, we compare the evidence the Court relied on in *Direct Sales* to the evidence in this case. If we do that, according to Routon, we must conclude the evidence is insufficient. Specifically, Routon points out that the spores and grow kit are legal, unregulated products, and there was only one sale to Agent Smith, not the ongoing sales of large quantities encouraged by the seller's marketing methods as in *Direct Sales*. The premise of Routon's argument is that *Direct Sales* establishes specific requirements for finding a conspiracy in all types of seller-buyer situations.[10] Like the circuit court, we disagree with this premise. The Court in *Direct Sales* determined that there was a conspiracy on the facts of that case, applying the general principles regarding knowledge, intent, and the relationship between the two. To the extent a seller-

---

. [10] Of course, *United States v. Falcone*, 311 U.S. 205 (1940), and *Direct Sales*, 319 U.S. at 704 n.1, like the other federal cases cited by Routon that we discuss later in this opinion, are concerned with federal conspiracy statutes. They are not binding on Wisconsin courts in construing and applying Wisconsin statutes, but we consider them to determine their persuasive value. *See Humi v. Vlazny*, 2006 WI 87, ¶ 45 n.13, 293 Wis. 2d 169, 716 N.W.2d 807.

buyer situation is like that in *Direct Sales*, the evidence the Court considered relevant there to establish a conspiracy provides guidance; to the extent the seller-buyer situation is of a different type, the general principles are helpful but the specific analysis will necessarily involve other kinds of evidence.

¶ 29. Therefore, we decline to frame our analysis in this case by lining up the evidence here with that in cases that differ in significant ways. Instead, we analyze the evidence in this case to determine whether it is sufficient to prove that Routon and his mother entered into an agreement with Agent Smith to manufacture psilocybin/psilocin, using the general principles discussed in *Direct Sales*, which both parties agree are pertinent.[11] In that context, we will address Routon's specific arguments based on a comparison to other cases.

■

¶ 30. We first consider the evidence that Routon and/or his mother[12] knew that Agent Smith[13] intended to use the spores to illegally manufacture psilocybin/

---

[11] Neither party contends that, if there is sufficient evidence of an agreement, we must separately analyze whether Routon intended that the crime be committed. *See supra* at footnote 9.

[12] Although Routon was confined in the Virginia Department of Corrections at the time of Agent Smith's order, a reasonable inference from the evidence is that he continued to operate Spore Magic/Buzz Magic with his mother; and Routon does not argue otherwise on appeal. He also does not argue that evidence of knowledge his mother had cannot be attributed to him.

[13] We use "Agent Smith" for ease of reference, recognizing that the more accurate term in this context is "the buyer purporting to be Charles Hagberg,"

psilocin. We do not agree with Routon that this evidence was "equivocal." While it is true that the psilocybe spores are not an illegal product and are not regulated, as the drugs were in *Direct Sales*, their cultivation is illegal and the website disclaimer indisputably shows that Routon knew this. Even if it is reasonable to infer from the website that there is a market for purchasing psilocybe spores for legal "microscopic" use, there is abundant evidence from which it is reasonable to infer that Routon marketed the psilocybe spores to persons who wanted to use them for the illegal purpose of growing mushrooms and that this was the predominant part of the business: (1) the "stealth" comment on the packing slip; (2) the website links referring to mind-altering substances together with the lack of any website links to educational or research sites; (3) the reassurance that packages are modest and orders and addresses of customers are shredded; (4) the sale of grow kits together with the absence of any edible mushroom spores on the website; and (5) Routon's request to his mother to send some dead spores to his attorney so they could use those as a defense. The evidence is also sufficient to establish that Routon and/or his mother clearly knew that Agent Smith, in particular, wanted to use the spores for the purpose of growing the mushrooms: Agent Smith's handwritten order, which was filled, said so.

¶ 31. Routon argues that other evidence, as well as the lack of certain evidence, undermines the inference that either he or his mother had clear knowledge of the buyer's purpose. We disagree. Routon points to the disclaimers, but the court found these were a "sham" and a "smokescreen" and that is certainly a reasonable inference. Routon next refers to the fact that the email sent to Agent Smith, explaining when

the grow kit would arrive, did not specifically state that the spores she had received were psilocybe spores. However, Agent Smith's email inquiring about the grow kit referred to having received "the 9 syringe[e]s [she] had ordered"; she had ordered psilocybe spores; and the syringes she received were labeled as containing the psilocybe spores she had ordered. Given this evidence, the omission of an express reference to "psilocybe" spores in the Spore Magic/Buzz Magic email does not undermine the strong inference that the person sending the email knew the buyer waiting for the grow kit had ordered and received psilocybe spores.

¶ 32. Finally, Routon argues that the lack of evidence that the spores sold Agent Smith actually *were* psilocybe spores weakens any inference from other evidence that Routon knew that the spores would be used for an illegal purpose. However, even without that evidence, it is reasonable to infer that Routon was selling the psilocybe spores he was advertising. The alternative inference—that there was an elaborate scheme to make purchasers think they were buying psilocybe spores when they were not—is far-fetched.

¶ 33. We conclude there is sufficient evidence that Routon clearly knew that Agent Smith intended to use the spores to illegally manufacture psilocybin/psilocin.

¶ 34. With respect to intent to further, promote, and cooperate in Agent Smith's illegal growing of the mushrooms, we conclude the evidence reasonably shows that, knowing that Agent Smith wanted to grow the mushrooms, Routon's mother sent her the spores and the grow kit without attempting to verify that she was authorized under Wisconsin law to grow them. *See* WIS. STAT. § 961.01(13) and (19). Indeed, the handwritten order and its contents on non-business stationary in

themselves are evidence that Agent Smith was not one of the "practitioners" defined in § 961.01(19) who can lawfully grow the mushrooms. The fact that the packages were not shipped together does not undermine the significance of selling the grow kit: Agent Smith's email inquiry about the grow kit after receiving the spores and the response show that Routon and/or his mother knew that the same person—Charles Hagberg —had ordered the spores and a grow kit and was now awaiting the arrival of the grow kit to "get started." Sending the grow kit is thus evidence of furthering and cooperating in Agent Smith's stated intent to grow the spores into mushrooms.

¶ 35. The evidence identified *supra* at paragraph 30 as items (1)-(4) and the evidence that Spore Magic/Buzz Magic had been operating for four years provide a reasonable basis for inferring that the sale of psilocybe spores to persons who Routon and/or his mother knew intended to grow mushrooms is not an isolated sale, but is rather a predominant purpose of the business. In that context, the volume discount for psilocybe spores gives rise to a reasonable inference that Routon is promoting their sale, knowing of the illegal use. The evidence of the announced business practices of shredding records and addresses and sending items in "modest" packages gives rise to a reasonable inference that Routon intends to assist his customers in keeping their illegal activities undetected, which is another means of furthering and cooperating in those activities.

¶ 36. Routon, as noted above, argues that the single sale to Agent Smith is, as a matter of law, insufficient evidence of an agreement. However, in the cases on which he relies, there was no evidence, as there is here, of an ongoing business that had the predomi-

nant purpose of selling a product for an illegal use. *See, e.g., United States v. Berkery*, 919 F.2d 817, 821 (2nd Cir. 1990) (evidence that the defendants possessed on a single occasion a large quantity of a chemical whose only known use is to manufacture methamphetamine was not sufficient to show a conspiracy to manufacture methamphetamine because the possession was just as consistent with an intent to distribute to others as with an intent to manufacture, there being no evidence of either connection with an actual manufacturing operation or a pattern of importing the chemical); *State v. Maldonado*, 114 P.3d 379, 380–83 (N.M. Ct. App. 2005) (evidence that the defendant had sold non-prescription pseudoephedrine on two or three occasions to a person whom he believed used them to manufacture methamphetamine prescriptions and intended to sell some more to that person was insufficient to establish a conspiracy to commit trafficking in methamphetamine by manufacturing);[14] *United States v. Blankenship*, 970 F.2d 283, 288, 289 (7th Cir. 1992) (defendant's agreement to rent a house trailer for one day to a person manufacturing methamphetamine, knowing that was the intended use, was not sufficient to prove that he knew about, let alone joined, in "the entire . . . venture" of the drug ring, which is what the government charged; though he "may have joined, or abetted, a more

[14] The court in *State v. Maldonado*, 114 P.3d 379, 381 (N.M. Ct. App. 2005), viewed the issue as whether "a defendant whose only involvement is supplying generally available goods or services becomes a co-conspirator merely because he knows that the goods or services he provides may or will be used by another for a criminal purpose[.]" The court expressed doubts whether the legislature intended to include this fact pattern within the conspiracy statute and, applying the rule of lenity, resolved the doubt in favor of the defendant. *Id.* at 382–83.

501

limited agreement to manufacture a quantity of methamphetamine, . . . he was not charged with that offense"). *Cf. United States v. Bewig*, 354 F.3d 731, 736–37 (8th Cir. 2003) (while "a mere sales transaction, standing alone, cannot support a conspiracy conviction," there was sufficient evidence of conspiracy to distribute pseudoephedrine for the purpose of making illegal narcotics where the defendant managed a shop at a gas station and ordered and sold a disproportionately large quantity of pseudoephedrine, knowing that substance was used to make methamphetamine).

¶ 37. We do not agree with Routon that the evidence here shows "[a] single, casual transaction." Although there was only one sale to Agent Smith, the reasonable inference the court drew from the evidence is that Routon marketed and sold psilocybe spores and grow kits to a number of other purchasers as part of his ongoing business. This is important because evidence of an ongoing business may, as here, provide evidence of the seller's knowledge of the illegal use of the product sold and an intent to further, promote, and cooperate in that illegal use.

¶ 38. Routon also argues that he had no interest or stake in Agent Smith or any other purchaser growing mushrooms from the psilocybe spores. He cites to cases that discuss conspiracies to distribute illegal substances. *See, e.g., United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1992); *Blankenship*, 970 F.2d 283. However, as Routon acknowledges, there is no requirement that there be any stake in the venture. *Hecht*, 116 Wis. 2d at 627. And there is certainly no requirement that the "fronting" of sales or other involvement characteristic of conspiracies to distribute illegal drugs exist in cases that do not charge a conspiracy to commit that crime. Moreover, we conclude the evidence *does* provide a basis

for reasonably inferring that Routon had an interest or stake in Agent Smith and other purchasers growing mushrooms from the psilocybe spores he sold. While Agent Smith testified that a purchaser can obtain spores from the mushrooms he or she grows, she also acknowledged that people recommend vendors to others whom they know are interested in the same product. It is reasonable to infer that Routon had a financial interest in purchasers, including Agent Smith, growing psilocybe spores with grow kits sold by Spore Magic/Buzz Magic and being satisfied with the results: satisfied purchasers might wish to purchase other varieties of the psilocybe spores that Spore Magic/Buzz Magic offers and would more likely recommend to friends that they, too, purchase from Spore Magic/Buzz Magic.

¶ 39. In summary, we conclude there is sufficient evidence that Routon knew that Agent Smith intended to use the spores to illegally manufacture psilocybin/psilocin by growing mushrooms and that he intended to further, promote, and cooperate in Agent Smith's illegal growing of the mushrooms. We further conclude this evidence is sufficient to establish that Routon intended that the crime of manufacture of psilocybin/psilocin be committed and that he and his mother agreed with Agent Smith to commit the that crime. Because there is no dispute that there is also sufficient evidence of an overt act, we conclude there is sufficient evidence to prove all three elements of the charge beyond a reasonable doubt. Accordingly, we affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.