**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 6, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP32-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF902

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JACOB PERRY CAYER,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Brown County: TAMMY JO HOCK, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jacob Cayer appeals from an order committing him to the custody of the Department of Health Services for life, following a special

verdict finding that he was not guilty by reason of mental disease or defect (NGI) on two counts of first-degree intentional homicide, one count of attempted first-degree intentional homicide, and three counts of bail jumping. Cayer claims that: (1) the circuit court erroneously exercised its discretion by denying his motion to present evidence that a third party may have committed the homicides and attempted homicide; (2) the exclusion of third-party-perpetrator evidence deprived Cayer of his constitutional due process right to present a defense; and (3) there was insufficient evidence to support guilty verdicts on the homicides and attempted homicide charges (which would also be fatal to his bail jumping convictions).[1] We reject each of these contentions and affirm the order of commitment.

## BACKGROUND

¶2 According to the complaint, Jason[2] called 911 on the evening of June 7, 2016, to report that there was a man in his residence who was "trying to kill the entire family" and had stabbed Jason, Jason's girlfriend, Sarah, and Sarah's mother, Helen. Jason identified the assailant as Sarah's ex-boyfriend, whom Jason knew by the first name Jacob. Jason informed dispatchers that he had a deep stab wound on his arm and was locked in a bathroom in the residence.

---

[1] Cayer attempted to supplement these arguments and the appellate record with two pro se submissions. We advised him by an order dated March 13, 2023, that this court does not entertain pro se submissions from represented litigants and that the appellate record is limited to items that were filed in the circuit court.

[2] This matter involves the victim of a crime. Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym instead of the victim's name. Although homicide victims are excluded from the confidentiality rule, we will also use pseudonyms for the two women who were killed to avoid disclosing information that could identify the confidential victim.

¶3     Responding police officers and medical personnel made contact with Jason at the residence and noted that Jason was bleeding from a wound on his arm. They found Helen dead in a bathtub inside the residence and Sarah lying in a neighboring backyard, suffering from multiple stab wounds. Medical personnel attempted to save Sarah's life but were unsuccessful. Meanwhile, police officers used a K9 unit to follow a trail into a nearby wooded area, where they located Cayer hiding and arrested him.

¶4     Prior to trial, Cayer moved to admit evidence that Jason and "others known and unknown, including Austin Green and Dillon Gray" committed the double homicide. Cayer alleged that Jason and Gray killed Helen and Sarah, abducted Cayer, and left Cayer at the murder scene to be framed. Cayer further asserted that the motive for the homicides was that Jason, Gray and Green were worried that Cayer "would cooperate with law enforcement" concerning Jason, Gray and Green's criminal activity as "drug-dealing gang members[.]"

¶5     In support of his allegations, Cayer first noted that Jason's 911 call established that Jason was in the house on the day of the murders. Cayer next asserted that a Brown County Jail inmate, Andy Stewart, told defense investigators that he heard Green say, "I killed 2 people and they arrested a white guy for it." Stewart also heard Gray "bragging about being a gang-banger[,]" although Stewart believed Gray was "just talking to try to get 'Street Creds[.]'" Cayer acknowledged that Green was incarcerated at the time of the double homicide, but he alleged that Green nonetheless could have conspired with Jason and Gray. In addition, Benjamin Gunn told the defense investigators that Sarah had told Gunn she had a stalker. Gunn said that when he stayed overnight at Sarah's house on one occasion, Gunn and Sarah observed footprints in the snow next to the window of a room in which they watched a movie. In its response to the motion, the State

argued that these links were tenuous and also pointed out that Jason had no opportunity to kill Helen because Helen was killed "substantially prior" to Sarah, while Jason was at work.

¶6 At the motion hearing, Cayer added an allegation that Jason had committed the double homicide because Jason wanted to gain access to money Sarah had inherited from her father. After the circuit court denied the motion, Cayer filed a second third-party-perpetrator motion, focused solely on Jason. The second motion alleged that: (1) Helen disliked Jason because she believed that Jason was taking advantage of Sarah; (2) Helen wanted Jason to stop dating Sarah and to move out of Helen's house; (3) Jason killed Helen to avoid eviction; and (4) Jason killed Sarah to cover up his murder of Helen. The court denied Cayer's second motion without holding an additional hearing.

¶7 The circuit court initially found Cayer incompetent to stand trial, but it later determined that Cayer had been restored to competency with the assistance of involuntary medication. Cayer subsequently changed his plea to NGI.

¶8 During a bifurcated NGI trial, Jason testified that he lived in a house with his girlfriend, Sarah, and her mother, Helen. On June 7, 2016, Sarah picked up Jason from work at about 7:30 p.m. When Jason and Sarah arrived home after making a stop at a Walmart store, they entered the house through a garage door leading into the kitchen area. Sarah went to check on her mother because the shower was running, and she discovered Helen's body in the bathroom. As Sarah returned to the kitchen and attempted to call 911, Cayer came out of a laundry room and first attacked Sarah and then Jason with a knife.

¶9 Jason further testified that—after being stabbed all the way through his arm into his chest—he ran into the garage to grab a shovel. Sarah and Cayer

4

followed Jason into the garage, at which time Jason swung the shovel at Cayer and struck him in the face. Jason then got back into the house leaving Cayer and Sarah in the garage. Jason made his way into a bathroom, locked the door, and called 911. An ambulance later transported Jason to the hospital, where he was treated for a chest lesion and a severed artery, as well as severed tendons in his arm.

¶10 A responding police officer testified that Cayer was covered in blood when the police located him nearby the house and arrested him. At the time of his arrest, police recovered from Cayer Sarah's phone, some rope, and two gloves. Following the arrest, an ambulance transported Cayer to the hospital for evaluation and treatment of his injuries and to process his body for evidence.

¶11 At the hospital, Cayer told a police officer during a recorded conversation that Sarah had made a rape allegation against him that really upset both him and his mother.[3] Cayer said that the anger was building up inside him as he rode his bicycle to Sarah's house that evening, and he was ready to "get back at the entire world." Cayer told police that he entered the house through Sarah's bedroom window and that he attacked Sarah with a knife in the house, in the garage, and again in "foliage" outside the house as she tried to flee. Cayer also said he fought with a man who was with Sarah and whom Cayer described as wearing a "gas station" type work shirt. Cayer further admitted to "hacking" a woman in a bloody bathroom with something "like a hammer, but not a hammer" and to washing his feet in a sink. Cayer drew a map showing where he believed he had dropped the knife he used to stab Sarah. Cayer then demonstrated with a

---

[3] The circuit court instructed the jury that there was no information that any such allegation was ever made, and that Cayer's statement was presented only for the jury's consideration as to motive.

pen how he had stabbed Sarah. At the end of the interview, Cayer asked whether he would be going to jail or "somewhere psychiatric."

¶12 Police located a knife where Cayer had indicated on his map that it would be found. The knife contained Sarah's DNA. Swabs taken from Cayer's hands at the hospital also contained Sarah's DNA. A tire iron wrapped in duct tape recovered from the scene contained both Cayer's and Helen's DNA. A forensic examination of Jason's phone showed that the phone had connected to a Walmart store's Wi-Fi at 7:50 p.m., twenty minutes before the 911 call was made.

¶13 Medical examiner Dr. Vincent Tranchida performed the autopsies on Sarah and Helen. Tranchida concluded that Sarah's death was the result of homicide caused by stab wounds to her torso that perforated her lung, aorta, heart, diaphragm, and liver. Tranchida concluded that the cause of Helen's death was "homicidal violence" including: (1) stab wounds to her torso; (2) blunt force trauma to her head, torso and extremities; and (3) compression of her neck. Tranchida also testified that there were abrasions on Helen's body that were consistent with the edge of the tire iron found at the scene.

¶14 Cayer took the stand in his own defense and denied any clear recollection of what happened on June 7, 2016, before he awoke in the hospital. Cayer testified that, the day before the murders, he was riding his bicycle when some people in a vehicle—possibly an SUV—threw something that "felt like a duffle bag" on him and "ganked" or abducted him. Cayer remembered lying in the vehicle with someone by his legs, and the next thing he knew he was struggling with someone named Adam in Sarah's kitchen. He heard Sarah telling him to get out of the house.

6

¶15 When Cayer later awoke in the hospital covered in blood, he was extremely confused. Based on the police officer's questions, Cayer came to the conclusion that he "must have like beat someone up or something," but he could not think of any reason that he would have fought with Sarah when he had other "true enemies" such as Dylan Gray.[4] Cayer testified that his statement to police was not a confession but, rather, a description of "discombobulated" "visuals" in his head combined with subconscious "assumptions" he made.

¶16 On cross-examination, Cayer acknowledged that he told police at the hospital that he had been "consumed by hate, pain, and suffering" while he was riding his bicycle "[b]ecause of women treating [him] like shit." In addition, Cayer testified that he had a visual of himself "swinging" with "red here[,]" but he could not specifically place his visual in the bathroom or see who he was swinging at—which could have been "the punks who brought [him] there[.]" Cayer further testified that he had a "very distinct memory of struggling with someone stronger than [him]." Cayer also confirmed that the backpack he had with him while bicycling contained duct tape, a hammer, a knife, and zip ties like the ones found near Helen's body in the bathroom.

¶17 The jury ultimately determined that Cayer had committed the charged offenses but that he was not criminally responsible for doing so due to a mental disease or defect. Cayer now appeals his subsequent commitment order, challenging the denial of his motions to admit third-party-perpetrator evidence and the sufficiency of the evidence to support the verdicts.

---

[4] Despite the different spelling, we infer that this "Dylan Gray" is the same "Dillon Gray" mentioned in Cayer's first third-party-perpetrator motion.

## DISCUSSION

### I. Third-Party-Perpetrator Evidence

¶18    Evidence offered to cast blame for a charged offense onto another person is not admissible unless it has a "legitimate tendency" to show that the other person actually could be guilty. *State v. Denny*, 120 Wis. 2d 614, 623-25, 357 N.W.2d 12 (Ct. App. 1984).    Under the legitimate tendency test, third-party-perpetrator evidence is admissible if the defendant can show that: (1) the third party had a motive to commit the charged offense; (2) the third party had the opportunity to commit the charged offense; and (3) there is some evidence to directly connect the third person to the charged offense that is not remote in time, place or circumstance. *Id.* at 624.

¶19    Although evidentiary rulings are generally committed to the circuit court's discretion, the decision to exclude third-party-perpetrator evidence also implicates a defendant's constitutional right to present a defense. *State v. Wilson*, 2015 WI 48, ¶47, 362 Wis. 2d 193, 864 N.W.2d 52.  We therefore independently review a circuit court's decision to exclude third-party-perpetrator evidence as a question of constitutional fact. *Id.*

¶20    The Sixth Amendment right to present a defense is not absolute but, rather, it is limited to the presentation of relevant evidence whose probative value is not substantially outweighed by its potential prejudicial effect.  *State v. Pulizzano*, 155 Wis. 2d 633, 646, 456 N.W.2d 325 (1990).  Thus, the exclusion of evidence does not violate a defendant's constitutional right to present a defense unless it deprives the defendant of material evidence so favorable to the defense as to "necessarily" prevent a fair trial. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) (citation omitted).  Evidence that fails to satisfy the *Denny* test is

not sufficiently relevant or material such that its exclusion would deprive the defendant of a fair trial. *See Wilson*, 362 Wis. 2d 193, ¶¶48, 89.

¶21 Here, Cayer asserts that the circuit court misapplied the *Denny* test and deprived him of his constitutional right to present a defense when it denied his motion to present evidence that Jason may have killed Sarah and Helen.[5] We disagree.

¶22 First, the motive prong of the *Denny* test requires a showing that the third party had a "plausible reason" to commit the crime. *Wilson*, 362 Wis. 2d 193, ¶57. Cayer's allegation that Jason wanted to prevent Cayer from cooperating with law enforcement concerning Jason's purported drug dealing does not provide any plausible reason for Jason to have killed either Sarah or Helen because their deaths would in no way have impeded such cooperation. Similarly, Cayer's allegation that Jason committed the double homicide because he wanted to gain access to money Sarah had inherited from her father is not plausible because Sarah's and Helen's deaths would not have provided Jason any such access. Next, Cayer's allegation that Jason killed Helen to prevent Helen from evicting him is not plausible because Helen's death itself could reasonably have been expected to lead to Jason's eviction (and, in fact, did lead to Jason's homelessness). Finally, Cayer's allegation that Jason killed Sarah to cover up Jason's murder of Helen is not plausible because Jason himself called 911 to report the attack and, as we discuss below, Jason did not have sufficient opportunity to kill Helen.

---

[5] Cayer does not develop any separate argument on appeal that the circuit court erroneously exercised its discretion or violated his constitutional right to present a defense by excluding evidence that Gray and/or Green were the actual perpetrators.

9

¶23 The opportunity prong of the *Denny* test requires the evidence to create a "practical possibility" that a third party could have committed the crime. *Wilson*, 362 Wis. 2d 193, ¶58. Undisputed evidence showed that Jason was at work until about 7:30 p.m. on the evening of the murders; that he was at a Walmart store at about 7:50 p.m.; and that he called 911 at about 8:10 p.m. While that limited time frame might have provided sufficient opportunity for Jason to have killed Sarah alone, there is no practical possibility that Jason would have had time to return home with Sarah; kill Helen in the bathroom and get the bathtub water overflowing to the extent found at the crime scene; somehow keep Sarah from calling 911 while he was killing Helen; clean himself up so as not to leave bloody footprints between the bathroom and kitchen; stab himself all the way through his own arm with the knife in the kitchen; have a fight with Cayer in the garage; chase Sarah outside and kill her; return to the house; stage the break-in through Sarah's window; and somehow plant Cayer's DNA on the tire iron and Sarah's DNA on Cayer, all before calling 911.

¶24 The direct evidence prong of the *Denny* test must take the defendant's theory "beyond mere speculation." *Wilson*, 362 Wis. 2d 193, ¶59. In support of his claim that he fulfilled this prong, Cayer points to: (1) an incident four years earlier in which Jason threatened three children in a park with a pocketknife; (2) a search on Jason's cell phone on the day of the murders for the song lyrics "famous last words"; and (3) photographs of Jason wearing "death metal" clothing. None of those things bear any relation whatsoever to the murders of Sarah and Helen, much less remove Cayer's theory from the realm of speculation.

¶25 In sum, Cayer's *Denny* motions failed to identify any evidence with a legitimate tendency to show that Jason committed the murders. We therefore

10

conclude that the circuit court properly denied the ***Denny*** motions and did not violate Cayer's constitutional right to present a defense by doing so.

## II. Sufficiency of the Evidence

¶26 Whether the State presented sufficient evidence to support a verdict is a question of law subject to our independent review. ***State v. Booker***, 2006 WI 79, ¶12, 292 Wis. 2d 43, 717 N.W.2d 676. We will affirm a verdict "unless the evidence, viewed most favorably to the verdict, is so lacking in probative value and force that no reasonable fact-finder could have found guilt beyond a reasonable doubt." ***State v. Routon***, 2007 WI App 178, ¶17, 304 Wis. 2d 480, 736 N.W.2d 530.

¶27 Cayer baldly asserts that the evidence was insufficient to show that he intentionally killed Helen and Sarah and attempted to kill Jason (which Cayer does not dispute would also violate the terms of his bond on pending charges) because: (1) Cayer was not inside the house when the police arrived; and (2) Jason's testimony was "without substantial corroboration" and was "entirely self-serving." These assertions are entirely undeveloped and, frankly, absurd.

¶28 First, Cayer entirely ignores our standard of review. Viewing the evidence most favorably to the verdict requires us to accept Jason's testimony, which the jury was entitled to find credible. Jason's testimony alone established all of the necessary elements of the homicide and attempted homicide charges. Second, Cayer fails to address his own confession or the DNA evidence that directly linked him to the murders of Helen and Sarah. Both the confession and the DNA evidence corroborated Jason's account. We further note that Cayer's presence outside of the house is entirely consistent with Sarah's body being

located outside the house. In sum, the evidence of Cayer's guilt was overwhelming and more than sufficient to support the verdicts on all six counts.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).