COURT OF APPEALS
DECISION
DATED AND FILED

August 5, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP545-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF114

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

JEREMIAH MCKENZIE,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Outagamie County: EMILY I. LONERGAN, Judge. *Affirmed.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jeremiah McKenzie appeals from a judgment convicting him of child abuse—intentionally causing harm. He contends that:

(1) the circuit court improperly admitted evidence that McKenzie had tested positive for drugs several weeks after the charged incident; and (2) there was insufficient evidence to support the intent element of the offense. We affirm on the grounds that McKenzie opened the door to having the challenged drug test evidence admitted for impeachment purposes and that McKenzie's intent could be reasonably inferred from the victim's forensic interview about how and why the incident occurred.

## BACKGROUND

¶2 The State charged McKenzie with child abuse based on allegations that a five-year-old child, "Kevin,"[1] showed up at school with a black eye and identified McKenzie as the person who had caused the injury.

¶3 At trial, Child Protective Services (CPS) social worker Brittany Plamann testified that she conducted a preliminary "minimal facts" interview with Kevin at his school on the day the injury was reported. Plamann observed three injuries around Kevin's left orbital bone and cheek: a bruise under the eye, a scar that was in the healing process, and a fresh scrape. Kevin said that the scar was old and the scratch was from a dog bite. When Plamann asked how Kevin had sustained the bruise, he told her that several days earlier his dad[2] became upset and hit him in the face with a stick because he and his baby brother had been playing with a basketball in a playroom in the house after having been told multiple times not to

---

[1] This matter involves the victim of a crime. Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we use pseudonyms when referring to the victim and his mother. All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Although McKenzie was not Kevin's biological father, McKenzie was in a long-term relationship with Kevin's mother, and Kevin referred to McKenzie as his dad.

do so. Kevin described the stick as long and tan with prongs or something "pokey-like" on one side.

¶4    After interviewing Kevin, Plamann interviewed Kevin's mother, "Sarah." Sarah told Plamann she was aware Kevin had sustained a dog bite near his eye, but she claimed that she did not have knowledge of any bruising. Because Kevin had identified McKenzie as what Plamann termed an "alleged maltreater," Plamann created a "safety plan," which required that McKenzie have no-contact with Kevin while the investigation was ongoing. McKenzie agreed to the plan, but he subsequently failed to follow it.

¶5    Fox Valley Child Advocacy Center (CAC) employee Nina Maroszek-Brennan conducted a forensic interview with Kevin the following day. The State introduced and played a recording of the interview. In the interview, Kevin said his dad had "whooped" him on more than one occasion, with a stick, a belt, and by hand. As to the incident in question, Kevin said his dad hit him with the stick on a couch in the playroom because he was playing with a ball, but Kevin explained that Sarah told him to say that she hit him with her hand because if he spoke about the stick, his dad could not continue living with them. Kevin said that his dad held him by his shirt and hit him so hard that he heard a "bang." Kevin said that his dad had gotten the stick, which had "pointy" spikes on one side of it, from Walmart, and that he stored it in an upstairs room by the chimney.

¶6    Nurse practitioner Jennifer Yates examined Kevin. She observed that the bruising to Kevin's face was consistent with his assertion of having been struck in the face with a stick several days earlier. Kevin also had linear, hyperpigmented lesions on his body that could have been caused by a belt. Yates documented the bruising on Kevin's face with photographs, as well as describing it in her report.

3

She also took a urine sample from Kevin, which revealed the presence of benzoylecgonine—a metabolite of cocaine. In Yates's experience, children of Kevin's age most commonly are exposed to cocaine from a "drug-endangered environment" in which the powder may be floating in the air or on surfaces that the child touches.

¶7 Lieutenant Tyrell West was a former school resource officer who interviewed McKenzie as part of the investigation of Kevin's injury. When West asked McKenzie about physical discipline in the residence, McKenzie stated that he had "threatened to get a stick and whoop [Kevin's] butt" but he had never actually done so. McKenzie denied any knowledge of the injury near Kevin's eye. During the interview, West observed the profile name "Lord Rico" on an Xbox in the living room, and McKenzie told West that he used the name "Lord Rico" as an Xbox profile.

¶8 Lieutenant Andrew Lindermann was a former patrol officer who was dispatched to the residence McKenzie shared with Sarah to assist CPS in delivering paperwork to Sarah at a time when McKenzie was suspected to be at the residence, despite the no-contact order. When Lindermann arrived, he observed a person later determined to be McKenzie "sprinting down the steps" and fleeing through some backyards.

¶9 Sergeant Craig Rohm was a K9 unit officer who accompanied Lindermann to Kevin's home and questioned Sarah while other officers were searching for McKenzie. When asked, Sarah claimed to have no idea who had just fled the residence, and she refused to give the officers permission to search the back yard.

¶10 Lieutenant Joanna Kolosso was a former school resource officer who became the lead investigator on Kevin's case. Kolosso was present during the minimal facts interview Plamann conducted with Kevin at his school the day the injury was reported, and Kolosso confirmed Plamann's account of the interview. Kolosso oversaw the documenting of Kevin's injuries with photographs at the school.

¶11 Kolosso was also present during the forensic interview Maroszek-Brennan conducted with Kevin the following day. In addition to Kevin's description of how he was injured, Kevin stated during that interview that Sarah had left him alone with McKenzie for a period of time when the safety plan was in effect.

¶12 Kolosso subsequently obtained and, with the assistance of other law enforcement officers, executed a search warrant for Kevin's residence. In the closet of a room with a chimney, the officers located a Walmart box containing a number of tan wooden boards or "sticks," some of which had black plastic or metal brackets with spikes on one side, that appeared to be some sort of unassembled furniture. The officers located three other similar sticks in the residence, including a broken one in the playroom.

¶13 Sarah and McKenzie both testified for the defense. Sarah testified that the family dog had bitten Kevin near his eye on the day the abuse was alleged to have occurred. The following day, Kevin stayed with his grandmother at her friend's house, and Sarah believed that was where Kevin was exposed to cocaine. Sarah did not notice any bruising to Kevin's eye in the days prior to, or on the morning of, the report being made. She denied that either she or McKenzie had ever struck Kevin with a stick or a belt. Sarah denied that she had been using cocaine around the time of the incident or that McKenzie had ever used cocaine. She denied

5

that McKenzie had been staying in the residence with her in violation of the safety plan.

¶14     Sarah also testified that she had repeatedly asked Kevin not to bounce the ball inside and that, sometime during that weekend, she had taken away the ball and Kevin's Xbox privileges because he disobeyed her. Sarah did not believe that McKenzie was even aware of the ball situation and believed McKenzie was upstairs. Sarah thought that Kevin made up the accusation because he was upset about his game being taken away and she gave several examples of other situations in which Kevin had lied.

¶15     Following Sarah's testimony, the State sought to admit other-acts evidence that—contrary to Sarah's testimony—McKenzie had two prior cocaine-related convictions. The circuit court ruled that the nature of the cocaine convictions would be excluded unless McKenzie himself opened the door by testifying "with respect to him never having used cocaine or something of that nature."[3]

¶16     During his testimony, McKenzie denied ever having harmed Kevin. He testified that prior to Kevin's child abuse report, Kevin had spent most of the weekend with his grandmother and McKenzie was never alone with Kevin that weekend. McKenzie did not notice any bruising on Kevin the day before the report.

¶17     McKenzie said that the "sticks" were part of an unassembled bed frame from Walmart that the children used to play sword fights. McKenzie denied any knowledge of anyone having bounced a ball inside the house. He stated that he

---

[3] The cocaine convictions would still be included in the count of McKenzie's prior convictions, if he testified.

was usually upstairs playing his own video games. He claimed that Kevin also used his "Lord Rico" profile name.

¶18    On cross-examination, McKenzie admitted that he had "sprinted" down the stairs when the police arrived at his residence while he was collecting his belongings because he was not sure whether he was allowed to be there when the children were not present. He also admitted that he had threatened to whoop Kevin's butt with a stick. He thought that some of the sticks may have been broken because the dog chewed on them.

¶19    The prosecutor then initiated the following exchange with McKenzie:

Q    Were you using cocaine at that time?

A    Absolutely not.

Q    Are you presently using cocaine?

A    Absolutely not.

Q    Was there cocaine in your house, to the best of your knowledge?

A    I—I wouldn't have that in my house. Whatever I did in the past, was in the past, okay? This is a whole new me right here. That's like 12 years ago. I'm done with that life, so, no, there wasn't any cocaine in my house.

….

Q    When I say at the time of this incident, I mean anytime immediately around this incident, not just that weekend, but that period of time were you using cocaine?

A    No.

¶20    On rebuttal, the State called social worker Plamann to testify that McKenzie had tested positive for cocaine about a month after the child abuse

incident. The court allowed the testimony as impeachment evidence, over discovery and relevance objections raised by McKenzie.

¶21 Consistent with WIS. STAT. § 948.03(2)(b) and WIS—JI CRIMINAL 2109 (2009), the circuit court instructed the jury that, in order to find McKenzie guilty of the charged offense, it needed to be convinced beyond a reasonable doubt that: (1) McKenzie caused bodily harm (meaning physical pain or injury, illness, or any impairment of physical condition) to Kevin; (2) McKenzie caused the bodily harm intentionally (meaning that he had the mental purpose to cause bodily harm to Kevin or was aware that his conduct was practically certain to cause that result); and (3) Kevin had not attained the age of 18 at the time of the alleged offense. The court further instructed, "You cannot look into a person's mind to find intent. Intent must be found, if found at all, from the defendant's acts, words, and statements, if any, and from all the facts and circumstances in this case bearing upon intent."

¶22 The jury returned a guilty verdict. On appeal, McKenzie challenges the admission of the drug test evidence and the sufficiency of the evidence to support the intent element of the offense.

## DISCUSSION

### I. Admission of Drug Test Evidence

¶23 Circuit courts have broad discretion to admit or exclude evidence and to control the order and presentation of evidence at trial. *State v. James*, 2005 WI App 188, ¶8, 285 Wis. 2d 783, 703 N.W.2d 727. We will uphold discretionary determinations so long as the circuit court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a

conclusion that a reasonable judge could reach." ***Ladwig v. Ladwig***, 2010 WI App 78, ¶15, 325 Wis. 2d 497, 785 N.W.2d 664 (citation omitted).

¶24    Here, the parties agree that evidence is not admissible unless it is relevant, meaning that it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *See* WIS. STAT. §§ 904.01, 904.02.  They further agree that "[a] witness's credibility is always 'consequential' within the meaning of … § 904.01." *See* ***State v. Hurley***, 2015 WI 35, ¶81, 361 Wis. 2d 529, 861 N.W.2d 174 (citation omitted).  McKenzie argues, however, that his positive drug test result did not undermine his credibility, and was therefore not relevant, because the test result did not directly contradict any of his testimony.

¶25    We disagree.  Evidence that McKenzie tested positive for cocaine about a month after the child abuse incident directly contradicted his testimony that his drug use "was in the past" and that he was not using cocaine in the "period of time" around the incident.  The test result also permitted a fair inference that, contrary to his testimony, McKenzie may have been keeping cocaine in the house. This information was relevant impeachment evidence because, if the jury found that McKenzie lied about his cocaine usage, it could conclude that he also lied about other matters, including whether he had struck Kevin with a stick.

**II. Sufficiency of the Evidence**

¶26    Whether the State presented sufficient evidence to support a verdict is a question of law subject to our independent review.  ***State v. Booker***, 2006 WI 79, ¶12, 292 Wis. 2d 43, 717 N.W.2d 676.  We review the sufficiency of the evidence by comparison to the instructions actually given to the jury, so long as those instructions conform to the statutory requirements of the charged offense.  ***State v.***

*Beamon*, 2013 WI 47, ¶22, 347 Wis. 2d 559, 830 N.W.2d 681. We will affirm a verdict "unless the evidence, viewed most favorably to the verdict, is so lacking in probative value and force that no reasonable fact[]finder could have found guilt beyond a reasonable doubt." *State v. Routon*, 2007 WI App 178, ¶17, 304 Wis. 2d 480, 736 N.W.2d 530 (citation omitted).

¶27 Here, McKenzie concedes that the evidence was sufficient to prove that he caused bodily harm to Kevin, who was under the age of 18. McKenzie nonetheless contends that the evidence was insufficiently detailed to prove that he had the mental purpose to cause bodily harm to Kevin or was aware that his conduct was practically certain to cause that result. Again, we disagree.

¶28 Kevin provided details as to who (McKenzie), had done what (struck Kevin in the face with a stick having pointers or spikes similar to those found by law enforcement in the home), when (while Kevin was playing with his brother a few days before he showed up at school with bruising under his eye), where (on a couch in a playroom in his house), and why (as discipline for disobeying an order not to play with a ball in the house).[4] The jury could reasonably conclude that McKenzie's act of striking Kevin in the face with a stick as a form of discipline demonstrated his intent to cause Kevin bodily harm. That is, it would be reasonable to infer that the point of striking Kevin was to cause him pain as a punishment for bouncing the ball in the house and/or as a disincentive to do it again. The evidence therefore was sufficient to support the verdict.

---

[4] Despite McKenzie's concession that the evidence was sufficient to prove that he caused bodily harm to Kevin, McKenzie argues that the term "whooped" refers to a vocalized sound, not striking someone. However, in the context of Kevin saying that the bruise on his face happened when his dad whooped him with a stick, the jury could reasonably interpret the term to mean that his dad struck him with a stick.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.