PER CURIAM.
¶1 John Makoons Peterson appeals a judgment, entered upon a jury's verdict, convicting him of one count of conspiracy to deliver more than fifty grams of methamphetamine. Peterson argues the evidence presented at trial was insufficient to support his conviction because the State failed to prove, beyond a reasonable doubt, that he entered into a single agreement with one or more individuals to deliver more than fifty grams of methamphetamine to third parties. He also argues that he is entitled to a new trial in the interest of justice because the real controversy was not fully tried. We reject Peterson's arguments and affirm.
BACKGROUND
¶2 On November 5, 2015, after an investigation that lasted over one year, the State charged fifteen individuals with one count each of conspiracy to deliver more than fifty grams of methamphetamine. The complaint alleged that Matthew Youngbauer was the main distributor or "hub" in the distribution system, and that he was responsible for the delivery of over sixteen ounces (approximately 453.5 grams) of methamphetamine in Bayfield County between October 2014 and October 2015. The complaint further alleged that Youngbauer distributed methamphetamine in Bayfield County mainly through Peterson, who would receive the methamphetamine from Youngbauer in Hinckley, Minnesota, and then deliver it to the various other defendants.
¶3 Peterson pled not guilty and entered a speedy trial demand. Upon the parties' stipulation, Peterson's case was severed from those of the other defendants. Approximately two weeks before trial, Peterson's attorney moved to withdraw from representing him. Peterson ultimately represented himself at trial, with the aid of appointed standby counsel.[1]
¶4 The State's first witness at trial was special agent Gerald Katchka. Katchka testified he began an investigation into methamphetamine trafficking in northwestern Wisconsin in October 2014. As part of that investigation, he interviewed Peterson on November 7, 2014, at the Bayfield County Jail. The interview was video recorded, and the State played portions of the recording for the jury during Katchka's testimony.
¶5 During the interview, Peterson said that an individual named Lance Gordon often wanted to buy methamphetamine, and Peterson would "point him in the direction" of someone who had some available at the time. He said Gordon would sometimes buy directly from him, but on other occasions he and Gordon would "throw in"[2] together because Peterson did not pay as high a price as Gordon.
¶6 Peterson told Katchka that he and Gordon last "threw in" together the week before, but they were "ripped off" by Bonnie Johnson, the person who was supposed to sell them the methamphetamine. Peterson stated Johnson had introduced him to dealers in the Hinckley area, and he eventually began buying from her and they started "hustling together." He told Katchka that Johnson "gets it real cheap ... a half ounce for five to six hundred," and she would charge Peterson $650 to $700 for a half ounce. However, Johnson then "ripped [Peterson and Gordon] off for like $900," which was supposed to buy .75 ounces of methamphetamine. Peterson stated he had sold about half an ounce of methamphetamine to various individuals in order to come up with the $900 that Johnson took.
¶7 Peterson also told Katchka that Johnson had introduced him to an individual named Trevor Hanson, who offered to introduce Peterson to Hanson's "connect"[3] in Duluth if Peterson introduced Hanson to prospective buyers. Hanson claimed that through his connect, Peterson could obtain "quarter pounds, half pounds, on the front"[4] for "dirt cheap prices." Thereafter, Peterson helped Hanson to sell about $1000 worth of methamphetamine.
¶8 Katchka testified that he interviewed Peterson a second time on November 10, 2014. That interview was also video recorded, and portions of the recording were played for the jury. During the November 10 interview, Peterson told Katchka that after Johnson "ripped off" Peterson and Gordon, a lot of people were looking for Gordon because they had given him money but had not received any drugs. Peterson and Hanson therefore sold methamphetamine to some of Gordon's buyers. Peterson explained that Hanson primarily handled these transactions, but Peterson was needed because he knew where to find the buyers. Hanson would get most of the money from the sales, but Peterson would charge the buyers more than what Hanson needed and would keep whatever money was left over.
¶9 Peterson further told Katchka that he had been dealing methamphetamine since February, and the largest amount of methamphetamine he had at one time was "a couple ounces"-i.e., about 56.6 grams. He said he had received that methamphetamine from a man called "Tank" in Minnesota who was a "heavy hitter." Peterson told Katchka most of his dealings were in Minnesota. He stated Gordon and other individuals traveled to Minnesota to purchase methamphetamine from him to bring back to Wisconsin. Peterson claimed that Gordon was "coming over like every day, twice a day, dropping 6, 7, 8, 900 dollars a pop." He stated $600 to $900 would buy two to three "eight balls,"[5] but the amount could vary based on how much his supplier charged and on how much he "taxed" Gordon.
¶10 Katchka testified it was common for Peterson to send and receive money through wire transfers, "basically [as] a pre-payment for methamphetamine being delivered." Katchka explained he had received records from wire companies documenting money transfers to and from Peterson. Summaries of those transactions were admitted into evidence at trial. Katchka also testified that law enforcement had attempted a controlled buy from Peterson on October 21, 2014. On that occasion, an informant, R.G., arranged to buy half an ounce of methamphetamine from Peterson for $900.[6]
¶11 On cross-examination, Peterson asked Katchka who "Matt Youngbauer" was. Katchka replied, "He is a gentleman that was from [the] Hinckley, Minnesota[,] area that was a large scale methamphetamine dealer that was involved in this conspiracy." Peterson then asked, "[W]hat was the relationship between him and me?" Katchka responded:
From you, during the interview, you had stated to me that he was one of your methamphetamine sources from Hinckley, Minnesota[,] and that he worked out of what was called the "A frame" which was his residence, which was an A-frame house that was-I believe "Tweeker (ph) Central" you had called it, which was flooded with methamphetamine dealers and users, and that from other sources also said that you had worked with Mr. Youngbauer and got methamphetamine from him on previous occasions.
¶12 Gordon also testified for the State at Peterson's trial. He testified he had known Peterson for five to seven years; he began purchasing methamphetamine from Peterson "[l]ater on throughout the years"; and he "started dealing with methamphetamine with [Peterson]" in 2014 or 2015. Gordon stated he would sometimes wire money to Peterson to pay for methamphetamine. However, he testified he had also wired money to Peterson to purchase a car. He said he "believe[d]" he had thrown in money with Peterson to buy methamphetamine in the past, but he could not recall any specific dates.
¶13 When asked if he ever sold any of the methamphetamine he received from Peterson to others, Gordon responded that he had. He also testified there were times when he had received methamphetamine from Peterson "on the front." Gordon testified that on one occasion he gave money to Peterson, who was supposed to give it to "a female" in exchange for methamphetamine. However, Gordon was "ripped off" and did not receive any methamphetamine. Gordon testified the money he had given Peterson for that transaction was from other people, who were upset with Gordon when they did not receive any methamphetamine.
¶14 The State next called Derrick McDaniel, who had made recorded statements to police about buying methamphetamine from Peterson. Excerpts from the audio recording of McDaniel's statements were played for the jury. McDaniel told police he had purchased methamphetamine from Peterson through an individual named "Jason" at least twenty times. He also told police that he and Jason went to Hinckley four or five times to buy methamphetamine from Peterson, and on those occasions multiple people contributed money to buy a quarter ounce or a half ounce. McDaniel stated he had purchased methamphetamine directly from Peterson at least six times. He would typically purchase an eight ball or a "teener,"[7] but the greatest quantity he ever obtained was an eight ball and a teener.
¶15 The State also called detective Gregg Thorhaug, who testified that an informant, R.B., had contacted him after Peterson offered to sell R.B. methamphetamine. Thorhaug told R.B. to set up a purchase, and a controlled buy for one gram of methamphetamine took place on March 6, 2015. On that occasion, R.B. received the methamphetamine from an individual named Letisha Belille. Thorhaug testified R.B. conducted another controlled buy on March 17, 2015, during which he purchased methamphetamine directly from Peterson. Special agent Jay Smith testified the methamphetamine that R.B. received from Peterson on that date weighed approximately thirteen grams. A video recording of the March 17 controlled buy was played for the jury.
¶16 R.B. also testified at Peterson's trial. He stated Peterson was in the front passenger's seat of Belille's vehicle during the March 6, 2015 controlled buy. R.B. also identified pictures of text messages he had exchanged with Peterson about purchasing seven grams of methamphetamine for $700. In other text messages, Peterson stated he could obtain 3.5 grams of methamphetamine for R.B. for $300, or for $250 if R.B. would drive to Hinckley to get it.
¶17 After the State rested, Peterson moved to dismiss, asserting the State had failed to prove its case. The circuit court denied Peterson's motion. Peterson did not present any evidence in his own defense. The jury found Peterson guilty of conspiracy to deliver more than fifty grams of methamphetamine. Peterson now appeals, arguing the evidence presented at trial was insufficient to support his conviction. In the alternative, he asks this court to grant him a new trial in the interest of justice, pursuant to WIS. STAT. § 752.35 (2017-18).[8]
DISCUSSION
I. Sufficiency of the evidence
¶18 Whether the evidence was sufficient to sustain a guilty verdict is a question of law that we review independently. State v. Smith , 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. We apply a "highly deferential" test when reviewing the sufficiency of the evidence to support a defendant's conviction. State v. Kimbrough , 2001 WI App 138, ¶12, 246 Wis. 2d 648, 630 N.W.2d 752. We may not substitute our judgment for that of the factfinder unless the evidence, viewed most favorably to the State and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. State v. Poellinger , 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). We must therefore affirm "[i]f any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt," even if we believe the trier of fact should not have found guilt based on the evidence before it. Id. This standard applies regardless of whether a verdict is based on direct or circumstantial evidence. Id. at 503.
¶19 Here, Peterson was convicted of conspiracy to deliver more than fifty grams of methamphetamine, contrary to WIS. STAT. § 961.41(1)(e)4. and (1x). Section 961.41(1x) refers to the definition of conspiracy set forth in WIS. STAT. § 939.31. Section 939.31, in turn, provides that a defendant may be convicted of conspiracy to commit a crime when he or she "with intent that a crime be committed, agrees or combines with another for the purpose of committing that crime ... [and] one or more of the parties to the conspiracy does an act to effect its object." Thus, the three elements of a criminal conspiracy are: "(1) intent by the defendant that the crime be committed; (2) agreement between the defendant and at least one other person to commit the crime; and (3) an act performed by one of the conspirators in furtherance of the conspiracy." State v. Peralta , 2011 WI App 81, ¶18, 334 Wis. 2d 159, 800 N.W.2d 512.
¶20 Criminal conspiracy "focuses on the subjective behavior of the individual defendant." State v. Sample , 215 Wis. 2d 487, 505, 573 N.W.2d 187 (1998). The defendant's intent to commit the crime may be inferred from his or her conduct. State v. Routon , 2007 WI App 178, ¶21, 304 Wis. 2d 480, 736 N.W.2d 530. Moreover, "[i]n the context of an agreement between a defendant charged under WIS. STAT. § 939.31 and another person, as long as the parties agree or combine by their words or actions, it is not necessary that the other person intend agreement." Sample , 215 Wis. 2d at 500.
¶21 When the State charges a defendant with conspiracy to deliver a controlled substance, "the sale of a small amount consistent with personal use is not sufficient to transform a possession charge against the buyer into a conspiracy to distribute." Routon , 304 Wis. 2d 480, ¶22. Instead, the State must present evidence "that an agreement existed between the seller and the buyer that the buyer will deliver at least some of the controlled substances to a third party." State v. Cavallari , 214 Wis. 2d 42, 50, 571 N.W.2d 176 (Ct. App. 1997). The agreement need not be an express agreement; "a mere tacit understanding of a shared goal is sufficient." Id. at 51-52. Furthermore, a conspiratorial agreement may be proved by circumstantial evidence. Id. at 51. The conduct surrounding the relevant transactions may constitute a sufficient basis to infer that an agreement existed to deliver drugs to third parties. Id. at 53. In particular, evidence of multiple transactions for large quantities of drugs inconsistent with personal use, along with evidence that one person is "fronting" drugs to the other, may be sufficient to establish a tacit agreement to deliver drugs to third parties. See id. at 53-54.
¶22 Applying the above standards to this case, we conclude the evidence at trial was sufficient to support Peterson's conviction for conspiracy to deliver more than fifty grams of methamphetamine. To obtain a conviction, the State needed to present evidence from which the jury could find that: (1) Peterson intended to deliver more than fifty grams of methamphetamine to third parties; (2) Peterson had an agreement with at least one other person to commit that crime; and (3) Peterson or one of his coconspirators performed at least one act in furtherance of the conspiracy. See Peralta , 334 Wis. 2d 159, ¶18.
¶23 The evidence was sufficient for the jury to make these findings. The State presented evidence that Peterson had received methamphetamine from Youngbauer, a "large scale methamphetamine dealer," and had also received "a couple ounces"-i.e., just over fifty-six grams-from a man called "Tank" in Minnesota. The State also presented evidence that Peterson delivered the methamphetamine he purchased to third parties. Peterson admitted during his recorded interviews with Katchka that he had sold methamphetamine to Gordon and that he and Hanson had worked together to sell methamphetamine to third parties. Gordon confirmed in his testimony that he had purchased methamphetamine from Peterson. In addition, the jury heard McDaniel's recorded interview, in which he admitted purchasing methamphetamine from Peterson on numerous occasions, both directly and through an individual named Jason. The jury also heard testimony about two controlled buys involving Peterson and R.B.
¶24 Moreover, Peterson stated in one of his recorded interviews that after Johnson "ripped off" Gordon and Peterson by taking their money and failing to provide the promised .75 ounces of methamphetamine, Gordon's "people" were angry at him because Gordon had taken their money and had not delivered any drugs. This evidence supports an inference that Peterson knew Gordon intended to distribute his portion of the .75 ounces to third parties. Peterson further explained that, because Gordon had been unable to deliver, he and Hanson acted together to sell methamphetamine to Gordon's buyers. In addition, Gordon testified that he sometimes received methamphetamine from Peterson "on the front." Finally, McDaniel conceded in his recorded interview that some of the methamphetamine he and Jason obtained from Peterson was for distribution to others. All of this evidence, taken together, would have permitted the jury to find that at least a tacit agreement existed between Peterson and several coconspirators to deliver methamphetamine to third parties. The same evidence also supports a finding that multiple parties committed acts in furtherance of the conspiracy.
¶25 The evidence further shows that Peterson-the only individual charged in this case-intended to deliver more than fifty grams of methamphetamine. McDaniel told police that he personally bought methamphetamine from Peterson at least six times, and each time he purchased amounts ranging from a teener (1.75 grams) to an eight ball plus a teener (5.25 grams). Thus, McDaniel purchased a minimum of 10.5 grams of methamphetamine from Peterson on those occasions.
¶26 McDaniel also said that he and Jason went to Hinckley four or five times and bought a quarter ounce to a half ounce of methamphetamine from Peterson on each trip. As one ounce equals approximately 28.3 grams, the total amount that McDaniel and Jason purchased from Peterson on those occasions was somewhere between 28.3 and 70.75 grams. Based on McDaniel's statements to police, the jury could have found that the minimum amount of methamphetamine Peterson delivered to McDaniel, individually, and to McDaniel and Jason, together, was 38.8 grams. There was also evidence that Peterson sold thirteen grams of methamphetamine to R.B. as part of a controlled buy on March 17, 2015, which brings the total amount sold up to 51.8 grams.
¶27 In addition, Peterson told police that he and Gordon "threw in" together to buy three quarters of an ounce of methamphetamine from Johnson, which equals 21.2 grams.[9] Peterson also stated he sold half an ounce of methamphetamine-i.e., 14.1 grams-to various individuals to obtain the $900 that he and Gordon paid to Johnson. There was also evidence that Gordon wired Peterson $2810 during October 2014. Peterson told police he charged Gordon a minimum of $300 for an eight ball, which is approximately 3.5 grams. Thus, if even half of the money Gordon wired Peterson was for methamphetamine, the amount purchased would still constitute about 16.3 grams.
¶28 The transactions summarized in the preceding paragraphs are only a fraction of those that the State proved Peterson helped to facilitate. The total amount of methamphetamine delivered in these transactions was, conservatively, approximately 103 grams. The evidence was therefore sufficient for the jury to find that Peterson conspired to deliver more than fifty grams of methamphetamine.
¶29 Peterson's argument that the evidence at trial was insufficient to support his conviction relies almost entirely on United States v. Townsend , 924 F.2d 1385 (7th Cir. 1991). Based on Townsend , he claims the State was required to prove that a single agreement existed between Peterson and another individual to deliver more than fifty grams of methamphetamine to third parties, and that both conspirators intended to deliver that amount. Peterson is mistaken. To prove that Peterson conspired to deliver more than fifty grams of methamphetamine, the State had to prove: (1) that Peterson intended to commit that crime; (2) that Peterson agreed with at least one other person to commit the crime; and (3) that one of the conspirators performed an act in furtherance of the conspiracy. See Peralta , 334 Wis. 2d 159, ¶18. As explained above, the evidence at trial was sufficient for the jury to find that each of these elements was satisfied.
¶30 In addition, Peterson's reliance on Townsend is misplaced. The question there was whether the government had produced sufficient evidence that the nineteen defendants in that case were part of a single conspiracy to distribute drugs, such that each could be held responsible for the substantive crimes committed by the others and could be convicted based upon the same evidence at a single trial. See Townsend , 924 F.2d at 1388-89. To convict the defendants of being a part of a single conspiracy at one trial, the government had to prove that "each defendant was a member of the same conspiracy." Id. at 1389. In other words, the government had to establish that each defendant "knew of, or intended to join, a larger agreement between Marquez"-the "hub" of the distribution ring-"and others to distribute drugs." Id. at 1390-91.
¶31 In evaluating whether the government had met this standard, the Seventh Circuit noted the evidence "clearly demonstrated that all but one of the defendants conspired with someone to distribute drugs." Id. at 1388. The court concluded, however, that while the government had shown that four of the defendants were part of individual conspiracies with Marquez to distribute drugs, nothing showed that those four defendants had an agreement to work with the other codefendants toward a common criminal purpose. Id. 1395-1410. The evidence was therefore insufficient "to establish that [the four defendants] agreed to join the single, ongoing conspiracy to distribute drugs charged in the indictment." Id. at 1410.
¶32 Townsend is distinguishable. Unlike Townsend , this case involves a single defendant-Peterson. The State presented evidence that Peterson was buying methamphetamine from multiple sources, particularly Youngbauer, and was entering into multiple agreements to deliver it to various buyers for resale, sometimes "on the front." Unlike the defendants in Townsend , Peterson was the "hub" of the conspiracy alleged at trial.[10] There was no suggestion in Townsend that the evidence would have been insufficient to convict the "hub" in that case-Marquez-of conspiracy to deliver.
¶33 Ultimately, the evidence at trial was sufficient for the jury to find that Peterson intended to sell more than fifty grams of methamphetamine to third parties, and that various individuals combined with Peterson to effectuate that purpose and performed acts in furtherance of the conspiracy, even if they did not know the amounts at issue or that Peterson was working with others to achieve the same goal. No more was needed to convict Peterson of the charged offense.
II. New trial in the interest of justice
¶34 Peterson argues, in the alternative, that he is entitled to a new trial in the interest of justice under WIS. STAT. § 752.35. He claims the real controversy was not fully tried because the jury did not hear an important portion of McDaniel's interview, in which McDaniel stated that he and Jason obtained a quarter ounce of methamphetamine "pretty much every time [they] went to Hinckley." Peterson claims this statement undercuts McDaniel's earlier statement to police during the same interview that he and Jason purchased a quarter ounce or a half ounce from Peterson each time they went to Hinckley.
¶35 As the State points out, however, McDaniel's statement that he and Jason obtained a quarter ounce of methamphetamine "pretty much every time [they] went to Hinckley" was, in fact, played for the jury at trial. During its case-in-chief, the State played two excerpts from McDaniel's interview: the first excerpt ran from "two minutes fifty-two seconds" to "ten minutes thirty-four seconds," and the second ran from "twelve forty-eight" to "nineteen minutes." The statement Peterson claims the jury should have heard begins at sixteen minutes thirty-eight seconds. It therefore fell within the second excerpt that the State played at trial. Peterson concedes as much in his reply brief. Accordingly, Peterson is not entitled to a new trial in the interest of justice on the grounds that the jury did not hear McDaniel's statement.
By the Court. -Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

On appeal, Peterson concedes there would be no merit to an argument that the circuit court erred by allowing him to represent himself at trial. We therefore do not address that issue further.

According to the State, the term "throw in" means combining money to buy methamphetamine together. Peterson does not dispute the State's interpretation of this term.

Katchka explained at trial that a "connect" is a connection who can provide methamphetamine.

Peterson asserts that receiving drugs "on the front" means receiving them "without payment on the expectation of payment on a later date." The State does not dispute Peterson's interpretation of this term.

An "eight ball" of methamphetamine refers to one-eighth of an ounce, or approximately 3.5 grams. United States v. Slagg , 651 F.3d 832, 841 n.4 (8th Cir. 2011).

R.G. later testified that he met Peterson and Gordon in a McDonald's parking lot in Superior, Wisconsin, on October 21, 2014, and gave them the money for the controlled buy, but they never returned with any methamphetamine.

A "teener" of methamphetamine is one-sixteenth of an ounce, or about 1.75 grams. State v. Wilkinson , 2009 UT App 202, 216 P.3d 973, 975 n.3.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

The fact that Johnson "ripped off" Peterson and Gordon, and the transaction therefore was not completed, is immaterial. Because Peterson was charged with conspiracy, the delivery did not need to be complete in order for the amount of methamphetamine at issue in that transaction to count toward the total amount delivered. See State v. Peralta , 2011 WI App 81, ¶18, 334 Wis. 2d 159, 800 N.W.2d 512 ("The crime that is the subject of the conspiracy need not be committed in order for a violation of [ Wis. Stat. ] § 939.31 to occur; rather, the focus is on the intent of the individual defendant.").

The complaint alleged that Youngbauer was the "main distributor/hub" of a larger distribution system. Although Youngbauer was one of the fifteen individuals charged in the complaint, Peterson's case was severed from those of the other defendants, and he was tried separately. At trial, the State's theory was that Peterson was the "hub" of a conspiracy to distribute drugs in Bayfield County.